# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-40958

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

MARTIN ARAIZA-JACOBO,

      Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**
February 28, 2019

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Southern District of Texas

Before SMITH, DUNCAN, and ENGELHARDT, Circuit Judges.

STUART KYLE DUNCAN, Circuit Judge:

Martin Araiza-Jacobo was caught attempting to cross the United States border carrying two bags of hard candies impregnated with over 5.1 kilograms of methamphetamine. The central issue at Araiza-Jacobo's criminal trial was whether he knew what he was really carrying. The district court instructed the jury it could find Araiza-Jacobo had culpable knowledge if he had been "deliberately ignorant" of the disguised drugs. "We have often cautioned against the use of the deliberate ignorance instruction," *United States v. Oti*, 872 F.3d 678, 697 (5th Cir. 2017), because it can lead juries to dilute the *mens rea* requirement in criminal statutes. We conclude it was error to give the instruction here. But we also conclude it was harmless error, given the

No. 17-40958

substantial evidence that Araiza-Jacobo actually knew he was carrying illicit candy. We therefore affirm his conviction.

## I.

## A.

Araiza-Jacobo worked as a *cruzador* ("crosser" in Spanish), carrying goods back and forth, on foot, over the Gateway Bridge connecting Brownsville, Texas to Matamoros, Mexico. He commonly delivered food and groceries, earning five or six dollars per trip. Though not a citizen, Araiza-Jacobo is a lawful permanent resident of the United States. As a regular *cruzador* who made multiple trips across the border every working day, Araiza-Jacobo was known to the U.S. border patrol agents who guarded the bridge.

On one of these trips, when crossing the bridge from Mexico into the United States, Araiza-Jacobo was inspected by Oscar Garcia, a border agent with over ten years of experience. Araiza-Jacobo told Garcia that he was going home and that he was crossing with two bags of candy and two *tortas* (sandwiches). By all accounts, Araiza-Jacobo did not appear excessively nervous as he approached Garcia. The two bags looked identical and were labeled "*El Piñatero Mega*, Piñata Party Candy Mix." The bags were partly transparent, revealing the candy inside. Araiza-Jacobo attempted to divert the agents' attention away from the candy bags with the sandwiches—which apparently smelled especially delicious because it was around lunchtime.

Despite the distraction, within twelve seconds Garcia suspected there was something "wrong" with the bags. The "weight" of the bags and their "texture" felt "kind of odd." He could see "through the clear [part of the bags], where you [could] see what was inside, that the specific contents wasn't [*sic*] what was … said to be outside." Upon closer inspection, Garcia detected two distinct types of candies, one that matched the graphics on the bags and one that did not. Garcia sent the bags through an x-ray machine and noticed that

2

the two types of candies appeared different in the x-ray images. Garcia and his partner agent, Eliodoro Ozuña, observed that the mismatched candies were unusually hard. Araiza-Jacobo became "really nervous" only after officials began a closer inspection of the bags. When asked why the candies were so hard, Araiza-Jacobo suggested they were "old candy." Although the packaging stated the candies were lollipops, some of the candies had no sticks.

The irregular candies, when opened with a knife, spilled out a crystalized "white powdery substance." Araiza-Jacobo suggested the substance was "Sal-Limon"—a salty and sour powder sometimes sold as candy. Garcia and Ozuña did not believe Araiza-Jacobo and handcuffed him. The agents called in a canine officer, whose dog alerted to the substance. A narcotics test kit yielded positive for methamphetamine. As it turned out, there were just over five kilograms of 98% pure methamphetamine inside the candies. Besides the sandwiches and bags, Araiza-Jacobo also had $440 and a battered Resident Card in his possession.

After the drugs were discovered, two Homeland Security Investigations agents, George Lopez and Javier Mata, interrogated Araiza-Jacobo for several hours. Araiza-Jacobo waived his *Miranda* rights and willingly participated. Although Araiza-Jacobo answered the officers' questions without hesitation, he contradicted himself and altered his story several times.

During the interview, Araiza-Jacobo stated he met a vendor selling candy next to the bridge, who introduced him to a man who needed two bags of candy brought into the United States for a payment of seven dollars. Araiza-Jacobo thought the man "looked trustworthy." He observed the bags, saw "they were candies," and thought they "looked okay." He also claimed the man said he would later call Araiza-Jacobo with the name and description of a woman who would receive the candy.

3

No. 17-40958

Araiza-Jacobo pointed out a phone number in his contacts belonging to the unknown man, and he allowed Lopez to examine his phone. Lopez noted several calls between Araiza-Jacobo's phone and the unknown man's number. Upon this revelation, Araiza-Jacobo began to change his story and continued to do so as more phone data came to light. Araiza-Jacobo had not mentioned these additional calls in his original story. Instead, he had suggested that his contact with the man had been more limited and that he did not know the man's name and had never seen him before. According to Lopez, Araiza-Jacobo was often evasive, answering questions not actually asked him. Finally, Araiza-Jacobo admitted he had been "ignorant" and "a dumbass."

Araiza-Jacobo stated that he had $440 in his possession because he was saving all the money he could from his odd jobs to get a new Resident Card, which was worn down through constant use. He was able to save all his earnings because his wife gave him money. Araiza-Jacobo later changed this story to say that his wife had not given him money in two years, but he still lived in a small house next to her house.

### B.

The government charged Araiza-Jacobo with four crimes: Possessing a Schedule II controlled substance (methamphetamine) with intent to distribute, conspiring to do so, importing methamphetamine, and conspiring to do so. *See* 21 U.S.C. §§ 841, 846, 952, 960, 963. Each crime has a *mens rea* requirement, meaning the government must prove the defendant committed the offense "knowingly and intentionally." *Id.*; *see also United States v. Moreno-Gonzalez*, 662 F.3d 369, 372–74 (5th Cir. 2011); *United States v. Morin*, 627 F.3d 985, 989 (5th Cir. 2010) (applying *mens rea* requirement). Araiza-Jacobo pleaded not guilty, contending he was unaware of the drug's presence in the candy bags.

At trial, because it was undisputed that Araiza-Jacobo brought methamphetamine into the United States from Mexico, the only issue was

whether he acted knowingly and intentionally. The government proceeded on two alternative theories of guilt: (1) Araiza-Jacobo had actual knowledge that he was carrying a controlled substance; or (2) he had remained deliberately ignorant of the drugs and of the schemes to import and distribute them.

Jesus Estrada Gerrero, a *cruzador* and friend of Araiza-Jacobo, testified at trial that he and Araiza-Jacobo had spent time together a few days before the arrest. While together, Estrada received a phone call from an unknown man in Matamoros, asking whether Estrada "could cross a piñata and a box of candy" and then, once in the United States, ship those items to Atlanta. Estrada declined because he did not know how to read, write, or ship things. Araiza-Jacobo, who had been listening, asked what the call had been about. After learning the details of the job, he requested the number, saying, "I'll do it." After calling the number and speaking with the anonymous man, Araiza-Jacobo told Estrada he had agreed to bring the goods across the bridge. Estrada testified that such random requests are not unusual for *cruzadores*. He also testified, however, that if someone wanted goods from Mexico, he would ask for cash and then purchase the items in Mexico himself. Estrada explained he was very careful about what he brought across the border because he feared transporting something illegal: "You don't know what they might have inside[.]" He cautioned Araiza-Jacobo about bringing goods from Mexico.

Dora Torres, who worked at a store near the Gateway Bridge in Brownsville, also testified. She explained she would occasionally ask Araiza-Jacobo to bring her a *torta* or candy from Mexico, including on the day of his arrest. Araiza-Jacobo had confided to Torres he was struggling to make ends meet, and she recommended he go north to find a better job. Araiza-Jacobo's estranged wife, Christina Araiza, also testified. She described Araiza-Jacobo as "street savvy" and a "very smart man" who knew "what's right and … wrong." She said his arrest surprised her: She "never thought he would do

something like that" because "he was always against everything illegal." Agents Garcia and Ozuña testified, relating the facts of their encounter with Araiza-Jacobo and their discovery of the drugs. Defense counsel introduced video evidence of the interrogation conducted by Lopez to establish that Araiza-Jacobo consistently maintained he knew nothing about the drugs.

After both sides had rested, the parties and the trial judge had a preliminary jury charge conference. The prosecution and the defense debated at length whether to include a deliberate ignorance instruction. Over defense counsel's objection, the district court decided that the instruction would be appropriate. The district court explained its reasoning as follows:

> [T]he video that was introduced by the defense consistently had the Defendant stating on numerous occasions that he had no knowledge of the transaction nor the individuals. But the inconsistencies that have been brought up by the Government, including the scenario as testified by his friend Mr. Estrada as to how the transaction was initiated in terms of Mr. Araiza knowing of the details and Mr. Estrada denying the transaction because of the uncertainty of the … product and the shipping to Atlanta, all raise significant fact issues that this court believes warrant the deliberate ignorance charge.

The jury ultimately received this instruction: "You may find that a Defendant had knowledge of a fact if you find that the Defendant was deliberately ignorant. Ignorant meaning that the Defendant deliberately closed his eyes to what otherwise would have been obvious to him." But the district judge warned the jury that it could not convict Araiza-Jacobo merely because he was "negligent, careless, or foolish" when transporting the methamphetamine across the border. The judge also gave a cautionary instruction, clarifying that "[d]eliberate ignorance does not lessen the Government's burden to show beyond a reasonable doubt that the knowledge elements of the crimes have been satisfied." In closing arguments, the prosecutor expressly referenced the deliberate ignorance theory, along with the actual knowledge theory.

No. 17-40958

The jury convicted Araiza-Jacobo on all four counts. The district court sentenced him to the statutory minimum of 10 years' imprisonment for each count—to be served concurrently—representing a downward variance from the sentencing guidelines.

Araiza-Jacobo appeals, contending the district court reversibly erred by instructing the jury on deliberate ignorance.

## II.

Because Araiza-Jacobo objected to the deliberate ignorance instruction, we review the district court's giving of that instruction for abuse of discretion. *United States v. Newell*, 315 F.3d 510, 528 (5th Cir. 2002). "The standard of review of a defendant's claim that a jury instruction was inappropriate is 'whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them.'" *United States v. Lara-Velasquez*, 919 F.2d 946, 950 (5th Cir. 1990) (quoting *United States v. Stacey*, 896 F.2d 75, 77 (5th Cir. 1990)). The court "may not instruct the jury on a charge that is not supported by evidence." *Id.* "In assessing whether evidence sufficiently supports a particular jury instruction, this Court views the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the Government." *United States v. Cessa*, 785 F.3d 165, 185 (5th Cir. 2015) (internal quotation marks omitted). Review of a deliberate ignorance instruction is "a fact-intensive endeavor" based on "the totality of the evidence." *United States v. St. Junius*, 739 F.3d 193, 204 (5th Cir. 2013).

## III.

### A.

We have stressed that a deliberate ignorance instruction "should rarely be given." *United States v. Nguyen*, 493 F.3d 613, 619 (5th Cir. 2007); *see also, e.g., United States v. Oti*, 872 F.3d 678, 697 (5th Cir. 2017) (observing "'[w]e

have often cautioned against the use of the deliberate ignorance instruction"')
(quoting *United States v. Mendoza-Medina*, 346 F.3d 121, 132 (5th Cir. 2003));
*see also, e.g., United States v. Bieganowski*, 313 F.3d 264, 289 (5th Cir. 2002);
*United States v. Peterson*, 244 F.3d 385, 395 (5th Cir. 2001). The instruction is
appropriate *only* when "the evidence shows (1) [the defendant's] subjective
awareness of a high probability of the existence of illegal conduct and
(2) purposeful contrivance to avoid learning of the illegal conduct." *Nguyen*,
493 F.3d at 619. The first prong often overlaps with an inquiry into a
defendant's actual knowledge, because "the same evidence that will raise an
inference that the defendant had actual knowledge of the illegal conduct
ordinarily will also raise the inference that the defendant was subjectively
aware of a high probability of the existence of illegal conduct." *Lara-Velasquez*,
919 F.2d at 952. "Thus, in many cases, the propriety of a deliberate ignorance
instruction depends upon evidence that the defendant purposely contrived to
avoid learning of the illegal conduct—the second prong of the deliberate
ignorance test." *Id.* "The defendant's purposeful contrivance to avoid guilty
knowledge may be established by direct or circumstantial evidence." *Id.*

We reiterate our reservations about deliberate ignorance instructions:
"The concern is that once a jury learns that it can convict a defendant despite
evidence of a lack of knowledge, it will be misled into thinking that it can
convict based on negligent or reckless ignorance rather than intentional
ignorance." *Oti*, 872 F.3d at 697 (internal quotation marks omitted). This
would dilute the *mens rea* requirement to a weak "*should* have known"
standard, which eviscerates the law's requirement that the defendant acted
"knowingly." *Id.* "[T]he district court should not instruct the jury on deliberate
ignorance when the evidence raises only the inferences that the defendant had
actual knowledge or no knowledge at all of the facts in question." *Id.*

No. 17-40958

After reviewing the totality of the evidence, we conclude that the district court erred by giving a deliberate ignorance instruction. To begin, we agree with the government there was sufficient evidence on prong one—that Araiza-Jacobo had "subjective awareness of a high probability of the existence of illegal conduct." *Nguyen*, 493 F.3d at 619. For example, Araiza-Jacobo's estranged wife described him as "street savvy" and a man who knew right from wrong. Araiza-Jacobo's friend Estrada testified he had cautioned Araiza-Jacobo many times about bringing goods from Mexico. When Lopez commented upon the several calls between Araiza-Jacobo's phone and the unknown man's phone, Araiza-Jacobo began to change his story about the events leading up to his arrest. His attempts to misdirect the agents with the sandwiches and the age and identity of the candy also suggest he knew there was more than just candy in the bags. Together these facts support the inference that Araiza-Jacobo had the required subjective awareness. *See id.* (first prong is met when "'the Government presents facts that support an inference that the particular defendant *subjectively* knew his act to be illegal,'" including evidence of defendant's "[s]uspicious and erratic behavior") (quoting *Lara-Velasquez*, 919 F.2d at 952) (emphasis in original).

But there is virtually no evidence to support the second prong of the inquiry—whether Araiza-Jacobo engaged in a "'purposeful contrivance to avoid learning of the illegal conduct.'" *Peterson*, 244 F.3d at 395 (quoting *United States v. Threadgill*, 172 F.3d 357, 368 (5th Cir. 1999)). The evidence points the other way: for instance, there is evidence that Araiza-Jacobo observed the bags and thought they looked fine, and also that he thought the unnamed man "looked trustworthy." Nor do we find evidence that the circumstances were "'so overwhelmingly suspicious that [Araiza-Jacobo's] failure to conduct further inspection or inquiry suggests a conscious effort to avoid incriminating knowledge.'" *Nguyen*, 493 F.3d at 621 (quoting *United States v. Daniel*, 957

9

F.2d 162, 169–70 (5th Cir. 1992)). Neither the district court's explanation for giving the instruction nor the government's arguments on appeal grapple with the lack of evidence supporting the second prong of the test. *See, e.g., Oti*, 872 F.3d at 697 (concluding deliberate ignorance instruction was inappropriate when "[t]he government failed to cite … specific evidence in the record that demonstrates that [defendants] purposely contrived to avoid learning of the [illegal] activities").

The government's argument on appeal demonstrates confusion on this point. Its principal brief contends that, "[a]s an experienced crosser, [Araiza-Jacobo] *should have noted* the same things [Garcia] noted: the bags were too heavy, some of the candies were rock-hard, some of the candies were not depicted on the outside of the bags, and the bags had been opened and resealed." (Emphasis added). This argument is improper. We will not water down the *mens rea* requirement of the charged crimes. The government cannot convict Araiza-Jacobo for what he should have known—that is, for negligence, carelessness, or foolishness—but only by proving beyond a reasonable doubt that he "knowingly and intentionally" committed the proscribed conduct. *See, e.g., Lara-Velasquez*, 919 F.3d at 951 ("If the choice is simply between a version of the facts in which the defendant had actual knowledge, and one in which the defendant was no more than negligent or stupid, the deliberate ignorance instruction is inappropriate."); *United States v. Kuhrt*, 788 F.3d 403, 417 (5th Cir. 2015) ("The proper role of the deliberate ignorance instruction is not as a backup or supplement in a case that hinges on a defendant's actual knowledge.").

Because the instruction was not supported by evidence showing Araiza-Jacobo engaged in any purposeful contrivance to avoid learning of the illegal conduct, the district court erred.

No. 17-40958

B.

Even when an erroneous deliberate ignorance instruction is given, the error "is harmless where there is substantial evidence of [the defendant's] actual knowledge." *Oti*, 872 F.3d at 698; *see also, e.g., St. Junius*, 739 F.3d at 204–05; *Mendoza-Medina*, 346 F.3d at 134. "Substantial evidence means relevant evidence acceptable to a reasonable mind as adequate to support a conclusion." *Simmons v. United States*, 406 F.2d 456, 464 (5th Cir. 1969) (citations omitted).

Araiza-Jacobo's credibility problems play a significant role in the harmless error analysis. He initially told the agents he had spoken to the unknown man only once on the phone—but the phone records revealed numerous calls between them. He also gave conflicting accounts of whether his estranged wife gave him money, leading to justified suspicion about how he actually earned an income and the $440 he was carrying. It is clear from the record that Araiza-Jacobo, though appearing to cooperate with investigators, was not interested in telling them the whole story. We have held that "less than credible stories," including inconsistent stories, can show knowledge. *United States v. Casilla*, 20 F.3d 600, 606 (5th Cir. 1994); *see also, e.g., United States v. Lopez-Monzon*, 850 F.3d 202, 208 (5th Cir. 2017) ("An 'implausible account provides persuasive circumstantial evidence of the defendant's consciousness of guilt.'") (quoting *United States v. Diez-Carreron*, 915 F.2d 951, 955 (5th Cir. 1990)); *United States v. Moreno*, 185 F.3d 465, 471–72 (5th Cir. 1999) (explaining that "inconsistent statements" can "indicate guilty knowledge") (citations omitted). Araiza-Jacobo argues these inconsistencies were not "substantial." We disagree. They related not only to minor details and personal background information, but also to the extent and nature of his contacts with the unknown man who gave him the drugs. That information was central to the question of his knowledge.

11

Moreover, the large quantity of drugs seized counts as circumstantial evidence of Araiza-Jacobo's actual knowledge of illegal activity. A high value or quantity of drugs can provide circumstantial evidence of knowledge. *See Lopez-Monzon*, 850 F.3d at 208 (explaining a "particularly high value of drugs" may be "probative of knowledge"); *United States v. Garcia-Flores*, 246 F.3d 451, 454-55 (5th Cir. 2001) (large "quantity of drugs" provides evidence for requisite "knowledge element"). The quantity of drugs in this case—5.1 kilograms—was significant and suggests that a drug trafficker would not have entrusted the shipment to an untested courier. Araiza-Jacobo counters that no competent evidence shows the value of the drugs. It is true that the dollar figure thrown out as part of a question by Lopez during the interrogation—$500,000—was a hypothetical and not a statement of fact. But the agents seized more than five kilograms of methamphetamine, and that amount cannot be characterized as small or insignificant.

Finally, other evidence suggests Araiza-Jacobo had actual knowledge of the drugs. The agents testified at trial that, when approaching them at the checkpoint, he tried to distract their attention from the bags with the sandwiches. He also sought to explain away the candy's unusual texture because it was "old." And when the agents discovered the powdery substance in the mismatched candies, he told the agents it was likely "Sal-Limon." These attempts to misdirect the agents suggest that Araiza-Jacobo had actual knowledge of the candy bags' illicit contents.

We therefore conclude that the government introduced substantial evidence showing Araiza-Jacobo had actual knowledge that the candy bags contained controlled substances. *See, e.g., United States v. Wofford*, 560 F.3d 341, 354 (5th Cir. 2009) (explaining "[t]he evidence supporting the inference that [the defendant] was subjectively aware that his conduct was unauthorized

and illegal also supports the inference that he had actual knowledge"). Accordingly, we find the error in the jury instruction was harmless.

AFFIRMED.