# United States Court of Appeals
# for the Fifth Circuit

No. 24-10600

United States Court of Appeals
Fifth Circuit

**FILED**

December 11, 2025

Lyle W. Cayce
Clerk

United States of America,

*Plaintiff—Appellee*,

*versus*

Ray Anthony Shoulders,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:23-CR-207-1

_____

Before Dennis, Graves, and Duncan, *Circuit Judges*.

Per Curiam:*[1]

Ray Anthony Shoulders, a physician's assistant, gave his patients amniotic fluid injections for pain management. He billed Medicare for these injections, but neither the procedure nor the product he used were approved for reimbursement. He was convicted of twelve counts of health care fraud

_____

* This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

[1] Judge Dennis concurs in the judgment. Although he believes it is at least debatable whether the district court erred in giving the deliberate-ignorance instruction, he agrees that any error was harmless.

No. 24-10600

and one count of conspiracy to commit health care fraud. On appeal, he challenges the district court's decision to instruct the jury on deliberate ignorance and the sufficiency of the evidence on the conspiracy charge. We AFFIRM.

## I.

Shoulders was a physician's assistant ("PA") at Southwest Sports and Spine ("SWSS"), a pain management clinic. He worked under Dr. Robert Menzies and was paid a 35% commission for his services, so his salary was based on amounts reimbursed by Medicare and insurance companies.

Shoulders and Menzies, along with a nurse practitioner, Hayley Gulilat, began using amniotic fluid injections to treat orthopedic pain, but such products were not approved for either orthopedic conditions or pain management. They initially used "Cell Genuity," with patients paying out-of-pocket.

In August 2020, Shoulders learned from a marketer selling a different amniotic fluid injection product, "Fluid Flow," that some providers had been able to bill Medicare for the product using the q-code "Q4206," which was unique to Fluid Flow. Fluid Flow was significantly more expensive than Cell Genuity and Shoulders told Lori Payne, SWSS' billing manager, to add Q4206 to SWSS' billing system, saying that it was "like Christmas around here!"

Using Dr. Menzies' National Provider Identifier("NPI"), both Shoulders and Gulilat began submitting claims to Medicare for using Fluid Flow when, in fact, they were still using Cell Genuity. Shoulders, as a PA, had his own NPI, but because Menzies was a physician, Medicare reimbursed claims under his NPI at a higher rate. Despite billing Medicare for his involvement, Menzies was never in the room when Shoulders administered the injections. After submitting two amniotic fluid injections to Medicare,

2

Shoulders texted both Gulilat and Menzies that he was "sweating on reimbursements lol." Later, he texted that he was up "thinking about medicare amnios," and Gulilat and Menzies responded jovially. Shoulders also told a Cell Genuity sales representative that he was using the q-code to bill Medicare for amniotic fluid injections, saying "Bro, this is retirement early."

Amanda Petroff, an employee in the clinic's billing office, discovered that the q-code should only be used for Fluid Flow injections, so she raised these concerns with the office manager, who deferred to Shoulders. She was also tasked with creating a hardship form for patients to apply to waive the copay on the procedures being billed to Medicare. Shoulders used the form to ensure that many patients did not pay anything for the injections. Denise Scott, a former Special Agent with the United States Department of Health and Human Services Office of the Inspector General, testified that often in healthcare fraud schemes, providers will see to it that patients are not responsible for the copay because, if the procedure is completely free, they are more likely to do it.

Eventually, Payne emailed Shoulders that Medicare had reimbursed SWSS for one of the injections and Shoulders responded, "This is a proud MOMENT." Payne asked Shoulders if she should contact Fluid Flow's sales representative to purchase more, but Shoulders declined. He continued to inject patients using Cell Genuity and did not purchase any additional Fluid Flow. Menzies later texted Shoulders that he couldn't "believe you got Medicare to pay for amnio." Shoulders responded that he would "do as many as I can before Medicare decides not to pay for [it]." He rapidly increased the number of injections he billed Medicare for, performing a total of 125 injections in August, September, October of 2020. Employees were even asked to work overtime to accommodate the number of injections. At one point, Petroff confronted Shoulders about continuing to use the q-code,

but Shoulders told her that he had been informed by the sales representative that it was covered and he would continue to use it. But Cell Genuity's sales representative never told customers that Medicare would reimburse providers for it.

At the end of October, the American Society of Interventional Pain Physicians ("ASIPP") alerted clinics that, despite claims by some sales representatives to the contrary, Medicare did not reimburse for amniotic fluid products used for pain management. ASIPP also warned that providers should not bill Medicare or other insurers for using these products and that knowingly doing so could result in criminal penalties. Menzies emailed Gulilat and Shoulders the alert, telling them "We need to discuss as a team how to proceed." Shoulders emailed ASIPP's general email address asking for additional guidance, but did not receive a response. Shoulders also reached out to Petroff, who told him the injections were not covered by Medicare. They then stopped billing Medicare for Fluid Flow, though SWSS had already received approximately $355,000 in reimbursements. During this time, Shoulders' own income dramatically increased, and he paid off a significant amount of his mortgage.

Over the next several months, Shoulders investigated whether other clinics were still successfully billing Medicare for Fluid Flow using the q-code. A Fluid Flow sales representative contacted him about purchasing some of her product and he told her "Lol, ASIPP not giving you guys any love right now." He confirmed with her that clinics were still successfully using the q-code and that Medicare had not audited them. He then confirmed with another sales representative that clinics using the q-code had not been audited and offered to talk to another marketer about his "business model" because he was "making a killing." But, as reflected in an FDA consumer alert issued in June, amniotic fluids were not approved for pain management.

No. 24-10600

In September 2021, Shoulders, Menzies, and Gulilat began billing Medicare using the q-code once again. Eventually, Shoulders even began calling Cell Genuity "Fluid Flow." But there were several differences between the two. They were packaged differently, and Cell Genuity could be stored at room temperature whereas Fluid Flow had to be kept frozen. Despite his assertions to Medicare, he used Fluid Flow "less than five times." In December 2021, Medicare discontinued the use of the q-code. SWSS had already received approximately $614,000 using that same code.

Shoulders was indicted and charged with one count of conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349 and twelve counts of health care fraud in violation of 18 U.S.C. §§ 1347 and 2. At trial, he argued that he mistakenly believed the q-code applied to all amniotic fluid injections, not just to Fluid Flow. He moved for a judgment of acquittal, arguing that the Government had not produced sufficient evidence of an agreement. The district court denied his motion. Shoulders also objected to the jury instruction on deliberate ignorance and proposed an alternative balancing instruction and a good-faith instruction, but the district court overruled the objection and did not give the alternative balancing instruction.

## II.

Shoulders first challenges the district court's use of the deliberate ignorance instruction.

## A.

Challenges to a district court's jury instructions are reviewed for abuse of discretion. *United States v. Buck*, 847 F.3d 267, 275 (5th Cir. 2017). This court "determine[s] whether the court's charge, as a whole, is a correct statement of law and whether it clearly instructs the jurors as to the principles of law applicable to the factual issues confronting them." *United States v. Delgado*, 668 F.3d 219, 227 (5th Cir. 2012) (citation modified). We must

"view the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the Government" to decide whether the evidence supports the given instruction. *United States v. Mendoza-Medina*, 346 F.3d 121, 132 (5th Cir. 2003) (quoting *United States v. Lara-Velasquez*, 919 F.2d 946, 950 (5th Cir. 1990)). If the district court erred in granting an instruction, it is nevertheless reviewed for harmless error. *United States v. Demmitt*, 706 F.3d 665, 675 (5th Cir. 2013).

**B.**

At trial, Shoulders argued his actions were not knowing or willful because they were based on a mistaken understanding that the injections were reimbursable. The Government requested a deliberate ignorance instruction and Shoulders objected. The district court overruled the objection and read the standard deliberate ignorance instruction to the jury:

> You may find that the defendant had knowledge of a fact if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him. While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact.

5th Cir. Pattern Jury Instructions (Criminal Cases) § 1.42 (2024).

The deliberate ignorance instruction, "also called the willful blindness, conscious avoidance, or ostrich instruction," is used to "ensure[] that a defendant cannot bury his head in the sand to avoid liability." *United States v. Lee*, 966 F.3d 310, 323 (5th Cir. 2020). We have repeatedly cautioned that the instruction should be used rarely, out of "fears that 'the jury might convict for negligence or stupidity.'" *Id.* at 324 (quoting *United States v. Ricard*, 922 F.3d 639, 655 (5th Cir. 2019)). Therefore, this instruction is only warranted "when the evidence shows that: (1) the defendant was subjectively

aware of a high probability of the existence of illegal conduct, and (2) the defendant purposely contrived to avoid learning of the illegal conduct." *United States v. Miller*, 588 F.3d 897, 906 (5th Cir. 2009). A district court should not give the instruction if the evidence only shows that the defendant had actual knowledge or no knowledge. *Mendoza-Medina*, 346 F.3d at 133–34.

## C.

Applying the first prong of this test, there is substantial evidence that Shoulders was subjectively aware of a high probability of the existence of illegal conduct. He used Dr. Menzies' NPI to bill Medicare instead of his own. He dismissed Petroff's warnings that the billing was in error. He exchanged a variety of communications expressing surprise and glee that Medicare was reimbursing SWSS for the injections. He ignored guidance from ASIPP. He even began calling Cell Genuity "Fluid Flow" even though they were packaged and handled differently. He knew something was afoot.

Turning to the second prong, the jury heard evidence that tended to support the inference that Shoulders had actual knowledge of illegal conduct, but some of the evidence also supported the inference that he contrived to avoid learning that his conduct was illegal. For example, on several occasions, Shoulders ignored information that billing Medicare for the injections violated Medicare's rules. *See, e.g.*, *United States v. Brown*, 871 F.3d 352, 356 (5th Cir. 2017) (concluding that the defendant had contrived to avoid learning of the illegal conduct when she ignored warnings that her business was routinely violating Medicare's billing requirements); *Delgado*, 668 F.3d at 228 (the instruction was warranted when defendant "asked selective questions" to billing experts and claimed not to have read documents that included standards the clinic was violating); *United States v. Crawley*, 381 F. App'x 462, 465 (5th Cir. 2010) (the defendant had purposefully avoided learning of the illegal conduct by failing to investigate further after hearing

from a Medicare instructor that the clinic's practices were wrong). There was evidence to support the inference that Shoulders contrived to avoid learning of the illegal conduct.

It bears repeating that the deliberate ignorance instruction should only be given in rare circumstances. *United States v. Oti*, 872 F.3d 678, 699 (5th Cir. 2017) (collecting cases). We emphasize that "[t]he proper role of the deliberate ignorance instruction is not as a backup or supplement in a case that hinges on a defendant's actual knowledge." *United States v. Kuhrt*, 788 F.3d 403, 417 (5th Cir. 2015). To prevent serious constitutional harm, district courts must carefully scrutinize whether the instruction is warranted based on the facts of each particular case. But our review is a deferential one which "afford[s] the trial court substantial latitude in describing the law to the jurors." *United States v. Rios*, 636 F.3d 168, 171 (5th Cir. 2011) (quoting *United States v. Santos*, 589 F.3d 759, 764 (5th Cir. 2009)). Given the evidence that was presented to the jury and defense counsel's argument that his actions were attributable to mistake and confusion, we find no abuse of discretion. *See United States v. Fiero*, 38 F.3d 761, 772 (5th Cir. 1994).

### D.

Even if giving the instruction was an abuse of discretion, it was harmless error. Erroneously giving the deliberate ignorance instruction "is harmless where substantial evidence of actual knowledge is presented at trial." *United States v. St. Junius*, 739 F.3d 193, 204–05 (5th Cir. 2013) (quoting *Miller*, 588 F.3d at 906). This inquiry "often overlaps" with the first prong "because the same evidence that will raise an inference that the defendant had actual knowledge of the illegal conduct ordinarily will also raise the inference that the defendant was subjectively aware of a high probability of the existence of illegal conduct." *United States v. Araiza-Jacobo*, 917 F.3d 360, 366 (5th Cir. 2019) (citation modified).

No. 24-10600

As discussed above, there is substantial evidence that Shoulders had actual knowledge of the illegality of the scheme. Amniotic fluid was not approved for pain management at all. Plus, they billed for one product while actually using a separate—and significantly cheaper—alternative. Shoulders knew about both of these practices. He repeatedly expressed surprise and excitement that Medicare was reimbursing him and told Menzies that he would use the q-code as much as he could before Medicare stopped paying. After ASIPP issued its consumer alert, Shoulders approached sales representatives to try to find out whether other clinics were still being reimbursed using the q-code. Finally, he billed for Fluid Flow when he was using Cell Genuity. Therefore, any error in granting the instruction was harmless. *See, e.g.*, *Lee*, 966 F.3d at 326 (finding error in giving the instruction harmless when there was substantial evidence of actual knowledge).

## III.

Shoulders next challenges his conviction of conspiracy to commit health care fraud based on the sufficiency of the evidence.

## A.

We review sufficiency of the evidence challenges de novo. *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012). But this review is still "highly deferential to the verdict" and asks simply whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Huntsberry*, 956 F.3d 270, 279 (5th Cir. 2020) (emphasis in the original) (quoting *United States v. Chon*, 713 F.3d 812, 818 (5th Cir. 2013)). Therefore, the question is "limited only to whether the jury's verdict was reasonable, not whether we believe it to be correct." *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011) (quoting *United States v. Williams*, 264 F.3d 561, 576 (5th Cir. 2001)). This inquiry requires us to view "the facts in the light most favorable to the verdict."

*United States v. Stanford*, 823 F.3d 814, 848 (5th Cir. 2016) (quotation omitted). Accordingly, we accept all credibility determinations and reasonable inferences that support the verdict and resolve any conflicting evidence in favor of the verdict. *Moreno-Gonzalez*, 662 F.3d at 372.

## B.

"To prove a conspiracy to commit health care fraud, the government must prove beyond a reasonable doubt that (1) two or more persons made an agreement to commit health care fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose." *Grant*, 683 F.3d at 643 (citing 18 U.S.C. §§ 1347, 1349). Shoulders argues that the Government failed to present evidence of an agreement between him, Menzies, and Gulilat.

"The Government may establish any element through circumstantial evidence." *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018). The jury is allowed to rely on its common sense and may "evaluate the facts in light of their knowledge and the natural tendencies and inclinations of human beings." *United States v. Holmes*, 406 F.3d 337, 351 (5th Cir. 2005) (citation modified). Still, "proof of an agreement to enter a conspiracy is not to be lightly inferred" and "similarity of conduct among various persons and the fact that they have associated with or are related to each other is insufficient to prove an agreement." *Id.* at 767–68 (citation modified). Likewise, mere presence or association with a member of the conspiracy are not enough to sustain a conviction. *United States v. Brito*, 136 F.3d 397, 409 (5th Cir. 1998). But these factors may still be relevant to support a conspiracy conviction. *Id.* The agreement "need not be spoken or formal, and the Government can use evidence of the conspirators' concerted actions to prove an agreement existed." *Ganji*, 880 F.3d at 767; *see also Chon*, 713 F.3d at 818–19 (noting

that an agreement "may be inferred from 'concert of action.'"). "[P]roof of a tacit agreement is sufficient." *United States v. Freeman*, 434 F.3d 369, 376 (5th Cir. 2005).

## C.

There is ample evidence to prove an agreement existed. The Government presented the jury with numerous communications between Shoulders, Menzies, and Gulilat that a rational juror could infer showed an agreement to fraudulently bill Medicare. For example, Shoulders texted Menzies and Gulilat that he was awake "thinking about medicare amnios :-)," and both laughed. After the first payment from Medicare, Menzies texted Shoulders that he "[s]till can't believe you got Medicare to pay for amnio," and Shoulders responded that he would do as many procedures as he could "before Medicare decides not to pay for [it]." After another payout, Shoulders texted Menzies, who responded that it was "[u]nbelievable." Indeed, once ASIPP issued its consumer alert that amniotic fluid injections used for pain management were not reimbursable by Medicare, Menzies emailed Shoulders and Gulilat, telling them they needed to "discuss as a team how to proceed."

After that, Menzies, Gulilat, and Shoulders all stopped using the q-code for several months and began to use it again at around the same time. Shoulders and Gulilat also both used Menzies' NPI to bill Medicare, requesting reimbursements for Fluid Flow when in fact, they were using Cell Genuity. Finally, they all reaped the financial rewards of this scheme. Shoulders and Menzies shared profits and SWSS dramatically increased the number of injections, with a corresponding increase in revenue to the clinic. Considering this evidence, a rational jury could find that Shoulders, Menzies, and Gulilat had agreed to use the q-code to fraudulently bill Medicare.

No. 24-10600

Shoulders argues that the Government failed to provide evidence of a concrete agreement between the conspirators and so the evidence of the conspiracy is simply text messages between Shoulders, Gulilat, and Menzies expressing "surprise" that Medicare would reimburse for the injections. However, the jury is free to reasonably construct the evidence however it wishes, and it is reasonable to conclude that the text messages show that they knew Medicare should not be reimbursing the clinic. *United States v. Moya*, 18 F.4th 480, 484 (5th Cir. 2021). Furthermore, profit-sharing, the dramatic increase in revenue, billing for Fluid Flow when they were using Cell Genuity, stopping and restarting use of the billing code at the same time, and Shoulders and Gulilat using Menzies' NPI all point to an agreement between them to fraudulently bill Medicare. *See, e.g.*, *United States v. Barnes*, 979 F.3d 283, 296 (5th Cir. 2020) (affirming a conviction of conspiracy to commit healthcare fraud when a defendant was aware of fraudulent conduct, received payment for it, and had billed for a particular service with suspicious frequency).

The jury heard significant circumstantial evidence that Shoulders agreed with Menzies and Gulilat to submit fraudulent claims to Medicare based on their communications and the circumstances of the scheme, which benefitted each of them substantially. Therefore, a rational jury could convict on the conspiracy count.

**IV.**

For the foregoing reasons, we AFFIRM.

12