# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 26, 2023

Lyle W. Cayce
Clerk

_____

No. 22-20337
_____

United States of America,

*Plaintiff—Appellee*,

*versus*

Clint Carr,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:18-CR-339-2

_____

Before Duncan and Wilson, *Circuit Judges*, and Schroeder, *District Judge*.[*]

Stuart Kyle Duncan, *Circuit Judge*:

A jury convicted Clint Carr of numerous federal drug offenses related to his ownership and operation of a Texas pharmacy that was, in reality, an illegal pill mill. On appeal, Carr's arguments for overturning his convictions largely concern four audio recordings that, after being vetted by a government filter team, were turned over to the prosecution. Carr contends

_____

[*] District Judge of the Eastern District of Texas, sitting by designation.

that the recordings intruded into privileged conversations with his attorney and prejudiced his defense and that, as a result, his indictment should have been dismissed. Finding Carr's arguments meritless, we affirm.

## I. Background

### A. Facts and Proceedings

Clint Carr and his business partner, Dustin Curry, were co-owners of CC Pharmacy. They opened the original CC Pharmacy in Houston and later added "satellite" locations in Austin and Round Rock, Texas. In 2018, a Houston grand jury indicted Carr, Curry, and others for operating CC Pharmacy as a "pill mill." Specifically, the indictment charged them with conspiring to unlawfully distribute controlled substances, unlawfully distributing and dispensing controlled substances (four counts), conspiring to launder monetary instruments, and engaging in monetary transactions in property derived from specified unlawful activity (two counts). *See* 21 U.S.C. § 846; 21 U.S.C. § 841(a)(1), (b)(1)(C), and 18 U.S.C. § 2; 18 U.S.C. § 1956(h); 18 U.S.C. § 1957 and 18 U.S.C. § 2. Curry pled guilty of conspiring to unlawfully distribute controlled substances and cooperated with the government. Carr went to trial.

In March 2022, Curry and CC Pharmacy employees testified in detail during a five-day trial about the pharmacy's criminal operations and Carr's involvement. The evidence showed the pharmacy was a voluminous and lucrative operation. From May 2016 to November 2017, it filled 18,327 fake prescriptions and dispensed 1,685,400 units of controlled substances including hydrocodone, oxycodone, Xanax, codeine cough syrup, and Soma. This generated at least $5.58 million in revenue.

Carr's basic defense at trial was that, while he "undoubtedly lied to drug suppliers, pharmacy inspectors, and employees," nonetheless "it was not outside the realm of plausibility that [he] was in fact a naïve and foolish

participant but not a conspirator." He concedes, however, "[t]hat CC Pharmacy was unlawfully distributing controlled substances," and that the government "overwhelmingly" proved this.

The jury found Carr guilty on all counts. He was sentenced to 240 months in prison to be followed by three years of supervised release.

### B. The Recordings

Most of Carr's appellate arguments concern four audio recordings, which he contends violated his attorney-client privilege and prejudiced his defense. Although none were introduced at trial, we provide this detailed background on the recordings in order to fully address Carr's arguments.

Two years before trial, in March 2020, Carr agreed to allow a government filter team to review potentially privileged evidence seized from CC Pharmacy. While all this evidence was to be released to the defense, none was to be released to the prosecution until "cleared" by the filter team. During their review, the filter team found four audio recordings that included either conversations with CC Pharmacy's attorney, Don Lewis (who died in 2020), or discussions about advice received from Lewis.

Recording 1 captures an August 15, 2017, conversation between Carr, Curry, and Lewis. Lewis advises Carr and Curry how to respond to the Drug Enforcement Administration's (DEA) seizure of drugs illegally transported by pharmacy employee Jeremy Newberry. After this discussion, Carr emailed pharmacist Megan Hanson, instructing her to falsely tell the DEA that Newberry was authorized to transport the drugs but had left the requisite DEA Form 222 on the pharmacy printer.

Recording 2 captures a conversation between Carr, Curry, and Newberry, also on August 15, 2017. Carr tells Newberry that he and Curry

had spoken with Lewis and, as a result, were going to plant the DEA Form 222 on the pharmacy printer.

Recording 3 captures an August 16, 2017, call between Curry and Newberry. Curry tells Newberry that he and Carr have talked to Lewis and have a "good gameplan on" to respond to the DEA seizure.

Recording 4 is from July 18, 2017—*i.e.*, a month before Recordings 1–3. It captures a call between Carr, Curry, and CC Pharmacy pharmacists Hassan Barnes and Jose Sanchez. Barnes discusses advice received from Lewis in response to concerns raised by Sanchez about the legality of transferring drugs between CC Pharmacy locations. Barnes and Carr discuss further plans to consult with Lewis.

In June 2021, the filter team gave Carr's attorney copies of the four recordings. On September 1, 2021, they asked Carr's attorney whether he intended to assert any privilege with respect to the recordings. The team explained that, in their view, any privilege was vitiated because CC Pharmacy had forfeited its charters and the State of Texas had terminated its registrations. When Carr's lawyer did not respond, the filter team followed up on September 9, 2021, stating they planned to file a motion with the district court to authorize release of the recordings to the prosecution. After some back and forth, Carr's lawyer finally said on September 14, 2021, that he intended to assert a privilege.

On November 1, 2021, the filter team filed a motion with the district court to allow release of the recordings. The motion noted Carr's opposition in a footnote. Because, as it later explained, the court mistakenly believed the motion was unopposed, it granted the motion the next day, before Carr responded. But the filter team did not immediately release the recordings. Rather, as they explained in an email to the prosecution, they waited to see whether Carr would respond or move for reconsideration. After two weeks

transpired with no action from Carr, the team finally released the recordings to the prosecution on November 16, 2021.

On January 10, 2022, the government filed its trial exhibit list with the district court. The list included Recording 4, but none of the other recordings. The local rules required Carr to object to the list by January 17, 2022, but Carr did nothing. At this point, as the district court later explained, because Carr failed to timely object, the court could have deemed any objections to the recordings waived. At a pre-trial hearing on January 20, 2022—almost three months after the filter team filed its motion and the court granted it—Carr finally told the court that he believed that the recordings were privileged and that he objected to their use at trial. The district court explained it had mistakenly thought the filter team's release motion was unopposed, and so gave Carr a week to file an objection, even though such objections had been due three days prior.

Instead of filing an objection, though, Carr moved to dismiss the indictment on January 26, 2022. The deadline for such motions had been December 1, 2021. Carr's motion argued that the prosecution's review of the recordings violated his attorney-client privilege, his Sixth Amendment right to counsel, and his Fifth Amendment right to due process. He also claimed the filter team misled the district court into believing the release motion was unopposed.

The district court denied Carr's motion as untimely. As the court explained, it had only allowed Carr to file an out-of-time objection to Recording 4, not an untimely motion to dismiss the indictment. Alternatively, the court found Carr's motion meritless because the recordings contained no discussions of trial strategy nor had the government intentionally interfered with Carr's right to counsel. Finally, the district court rejected Carr's contention that it had been misled by the filter team.

No. 22-20337

To the contrary, the filter team's "motion complied with the local and Federal Rules of Criminal Procedure; and there is no evidence that Government's counsel, either the filter team or prosecutors, attempted to mislead the Court, disregarded any applicable rules, or engaged in any unprofessional conduct."

The case then proceeded to trial and, as noted, the jury found Carr guilty on all counts.

Carr now appeals. He argues the district court erred by (A) denying his untimely motion to dismiss the indictment; (B) admitting evidence concerning Carr and Curry's plan to plant the DEA form on the pharmacy printer; and (C) suggesting at the preliminary charge conference that, if Carr testified, a "deliberate ignorance" instruction would be appropriate. We consider each issue in turn.

## II. Standard of Review

We review the denial of Carr's motion to dismiss the indictment as untimely for abuse of discretion. *United States v. Dennis*, 41 F.4th 732, 739 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 2616 (2023). If the district court did not abuse its discretion, we review the underlying motion for plain error. *United States v. Vasquez*, 899 F.3d 363, 373 (5th Cir. 2018). If it did abuse its discretion, we review the underlying motion *de novo. United States v. Ollison*, 555 F.3d 152, 160 (5th Cir. 2009).

We review the district court's evidentiary rulings for abuse of discretion. *United States v. Richard*, 775 F.3d 287, 295 (5th Cir. 2014). We review Carr's complaint about the deliberate indifference instruction for plain error, however, because it was unpreserved. *United States v. Ricardo*, 472 F.3d 277, 285 (5th Cir. 2006).

### III. Discussion

*A. Denial of Carr's Motion to Dismiss the Indictment*

*1. Untimeliness of the motion*

First, we consider whether the district court abused its discretion in denying Carr's motion to dismiss the indictment as untimely. District courts obviously have a strong interest in enforcing their deadlines. *See, e.g.*, *United States v. Santana-Dones*, 920 F.3d 70, 80 (1st Cir. 2019); *United States v. Trobee*, 551 F.3d 835, 838 (8th Cir. 2009) (noting importance of enforcing court-ordered deadlines); *see also* Fed. R. Crim. P. 12(c)(1). Nonetheless, courts may consider untimely motions for "good cause." Fed. R. Crim. P. 12(c)(3). "[A] showing of good cause requires a showing of cause and prejudice." *Dennis*, 41 F.4th at 739–40. Here, Carr shows neither.

As to cause, Carr first argues that the December 1, 2021, deadline for pretrial motions gave him "less than 20 days" to prepare a motion to dismiss the indictment, which he says was insufficient. We disagree. For starters, Carr counts from the wrong date. He reckons twenty days from when the pretrial motion deadline was set on November 10. But the district court ordered release of the recordings eight days earlier, on November 2. So, Carr was on notice of the principal ground for his motion to dismiss longer than twenty days before the deadline. Indeed, he had known for *months* that the filter team had the recordings and would seek to release them to the prosecution.

In any event, Carr fails to explain why twenty days were insufficient to prepare his motion. Criminal litigants often must act on shorter time-fuses. *See, e.g.*, Fed. R. Crim. P. 29(c)(1) (requiring motions for judgment of acquittal to be filed within fourteen days after trial); Fed. R. Crim. P. 33(b)(2) (requiring motions for new trial to be filed within fourteen days after trial). Indeed, Carr proved capable of working much more quickly in this case:

when the district court allowed him to file out-of-time objections in January 2022, he filed a motion to dismiss in only six days.

Carr next argues that, even if he had enough time, he could not have moved to dismiss the indictment until the government filed its exhibit list, which included Recording 4, on January 10. Only then, Carr contends, did he know the government would use the recording at trial. We again disagree. As the government points out, "Carr could have foreseen that the government would seek to use information that it had asked the district court to release." As discussed, Carr had known for months that the filter team had the recordings and, furthermore, he had known since at least September that they planned to move for authorization to release them to the prosecution.

Additionally, Carr fails to explain why he took no action to prevent the recordings' release to the prosecution after the district court's November 2 release order. One would have expected Carr to promptly alert the district court it was mistaken about Carr's opposing the motion. But even then, the filter team still waited until November 16 to release the recordings. In all that time, Carr did nothing. Instead, he waited more than two months to raise the issue with the district court, at which time the dispositive motion deadline had long expired. And even then, Carr did not ask for leave to file an out-of-time motion to dismiss the indictment but only asked for leave to object to the recordings' release. Given that chronic inaction, we cannot say the district court abused its discretion in finding no cause for Carr's untimely motion to dismiss.

Finally, Carr fails to show any prejudice, because, as explained in the next section, his arguments for dismissing the indictment are meritless. *See Dennis*, 41 F.4th at 739. Accordingly, the district court did not abuse its discretion in denying Carr's motion to dismiss as untimely. *Ibid.*

### 2. Merits of Carr's motion to dismiss the indictment

Because the district court did not abuse its discretion in denying as untimely Carr's motion to dismiss the indictment, we review the merits of that motion for plain error. *Vasquez*, 899 F.3d at 373. Accordingly, "we will reverse only if [Carr] shows error that is plain and affects his substantial rights, and even then, only if it seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Grzywinski*, 57 F.4th 237, 238 (5th Cir. 2023), *petition for cert. filed*, (Apr. 7, 2023) (citations omitted) (cleaned up).

### a. Sixth Amendment

We begin with Carr's Sixth Amendment argument. He claims the indictment must be dismissed because the prosecution violated his Sixth Amendment right to counsel by reviewing the four recordings. That argument fails. Even assuming any of the recordings were privileged, *but see infra* III(B), Carr's Sixth Amendment right to counsel had not attached when the recordings were made. That right attached when Carr's prosecution "commenced"—that is, when the grand jury indicted him in June 2018. *United States v. Diaz*, 941 F.3d 729, 738–39 (5th Cir. 2019) (per curiam) (quoting *Rothgery v. Gillespie County*, 554 U.S. 191, 198 (2008)). But the conversations at issue were recorded nearly a year before that—in July and August 2017.

Our decision in *Diaz* is squarely on point. There, as here, the government obtained and reviewed recordings of conversations appellant claimed contained information protected by attorney-client privilege. *Id.* at 739. We found no Sixth Amendment violation because, "when the recordings took place . . . [the] prosecution had not yet commenced." *Ibid.* (citing *Rothgery*, 554 U.S. at 198). So too here.

Carr's attempts to distinguish *Diaz* fail. First, he points out that *Diaz* found the recorded conversation contained no privileged information. True, but immaterial. *Diaz* turned on the fact that the "prosecution had not yet commenced" when the conversation was recorded. *Ibid.* That the conversation's subject matter was *also* non-privileged separately supported the court's decision (as it does here, *see infra* III(B)). *Ibid.*

Second, Carr argues that in *Diaz* the government reviewed the recording before the indictment, whereas here it did so afterwards. Again, that is immaterial. *Diaz* turned on the fact that "[a]t the point in the investigation when *the recordings* took place . . . prosecution had not yet commenced." *Ibid.* (emphasis added). When the prosecutors reviewed the recordings was of no moment.

Finally, Carr argues the recordings here, unlike in *Diaz*, were not made "at the behest and direction of the Government as part of their investigation," so the recordings are not "governmental act[s]." It is unclear why that distinction would help Carr. If anything, it shows that any governmental intrusion was less significant here than in *Diaz*.

In sum, we see no error, plain or otherwise, with respect to Carr's Sixth Amendment claim.

### b. *Fifth Amendment*

We next consider Carr's Fifth Amendment claim. He argues the prosecution's access to the recordings denied him due process. We disagree.

"Government misconduct does not mandate dismissal of an indictment unless it is so outrageous that it violates the principle of fundamental fairness under the due process clause of the Fifth Amendment." *United States v. Sandlin*, 589 F.3d 749, 758–59 (5th Cir. 2009) (quoting *United States v. Mauskar*, 557 F.3d 219, 231–32 (5th Cir. 2009)). The

government's actions must be "shocking to the universal sense of justice," and "such a violation will only be found in the rarest circumstances." *Mauskar*, 557 F.3d at 232 (citations omitted). "While rare, governmental intrusion into an attorney-client relationship has occasionally risen to the level of 'outrageous government conduct' violative of the Fifth Amendment's Due Process Clause." *United States v. Scarfo*, 41 F.4th 136, 172 (3d Cir. 2022), *cert. denied sub nom. Pelullo v. United States*, 143 S. Ct. 1044 (2023) (citation omitted); *see Gaetano v. United States*, 942 F.3d 727, 732 (6th Cir. 2019) ("Vanishingly few decisions have found a due process violation for government intrusion into the attorney client relationship."). A defendant asserting such a claim must also show "actual and substantial prejudice." *United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir. 1996); *see United States v. Williams*, 720 F.3d 674, 686 (8th Cir. 2013).

Nothing in the government's conduct here rises to the level of shocking or outrageous behavior that would justify dismissal under the Due Process Clause. As discussed, before releasing the recordings, the filter team contacted Carr's lawyer to ask whether he intended to assert a privilege—while explaining they did not believe the recordings were privileged. When Carr's lawyer did not respond for over a week, the filter team did not take this silence as license to go forward. Rather, they again asked whether Carr intended to assert a privilege. Because Carr's lawyer said that he would do so only after this second set of correspondence, the team moved the district court to authorize release of the recordings. And even when the district court prematurely granted that authorization the next day, the team still did not release the recordings because they believed Carr would take corrective action. It was only after two weeks passed with no word from Carr that the filter team finally released the recordings.

This hardly constitutes conduct that is "outrageous" or fundamentally unfair. *Sandlin*, 589 F.3d at 758–59. To the contrary, the

government afforded Carr every opportunity to oppose the release of the recordings, even assuming there was any basis to do so. *But see infra* III(B). Accordingly, we find no merit in Carr's due process claim and certainly no plain error on the district court's part.

In short, Carr cannot demonstrate any error, much less "clear or obvious" error, in the district court's denial of his motion to dismiss the indictment. *Vasquez*, 899 F.3d at 373 (citation omitted).

### B. Evidentiary Claims

Carr also contends the district court erred in admitting two pieces of evidence at trial: (1) Curry's testimony explaining how he and Carr planted the DEA Form 222 on the printer at the Round Rock CC Pharmacy, and (2) the email Carr sent to pharmacist Megan Hanson instructing her how to justify Newberry's transport of drugs to the DEA. Carr argues this evidence was "fruit[] of [the government's] unlawful intrusion into Carr's privileged communications" because it involved actions taken in response to advice they received from Lewis that was captured in Recording 1. We disagree.[1]

Carr cannot show any error because, as the government argues, the crime-fraud exception vitiates any privilege Carr could have claimed over Recording 1. "Under the crime-fraud exception to the attorney-client privilege, the privilege can be overcome where communication or work

---

[1] It is unclear whether Carr preserved this objection. Although he did object to admitting this evidence, his argument was that the evidence *itself* was privileged. That is somewhat different from the argument he now makes that the evidence was the "fruit" of an unlawful intrusion into his attorney-client relationship. *United States v. Lewis*, 796 F.3d 543, 545–46 (5th Cir. 2015) (explaining that "[t]o preserve error, an evidentiary objection must 'state[] the specific ground, unless it was apparent from the context,'" and that "a trial court judge must be fully apprised of the grounds of an objection" (quoting FED. R. EVID. 103(a)(1)(B), and *United States v. Polasek*, 162 F.3d 878, 883 (5th Cir. 1998))). In any event, we need not decide whether plain error review should apply because Carr cannot show any error to begin with as to admission of this evidence.

product is intended to further continuing or future criminal or fraudulent activity." *In re Grand Jury Subpoenas*, 561 F.3d 408, 412 (5th Cir. 2009) (citation omitted). "[W]here the government makes a *prima facie* showing that the attorney-client relationship was intended to further continuing or future criminal or fraudulent activity, the privilege does not exist." *United States v. Dyer*, 722 F.2d 174, 177 (5th Cir. 1983).

In the conversation captured in Recording 1, Carr solicited Lewis's advice about what Hanson should tell the DEA to cover up CC Pharmacy's wrongdoing. Lewis instructed Carr to have Hanson tell the DEA that she had authorized Newberry's drug transfer, and that Newberry had simply forgotten the requisite form. Carr promptly put that advice into action by emailing Hanson the falsehood-laden script for her call with the DEA. This establishes a *prima facie* case that Carr's communication with Lewis was "intended to further continuing or future criminal or fraudulent activity." *In re Grand Jury Subpoenas*, 561 F.3d at 412 (citation omitted). Because Recording 1 was non-privileged, the prosecution's use of Curry's testimony and Carr's email at trial could not have been the "fruit" of any unlawful intrusion into the attorney-client relationship.[2]

But even assuming Recording 1 was privileged, Carr fails to explain why the proper remedy would have been to exclude the evidence at issue. Both Curry's testimony and Carr's email plainly incriminated Carr. He does not argue that the prosecution had this evidence only because of its access to Recording 1. *Cf. United States v. Runyan*, 290 F.3d 223, 235 (5th Cir. 2002) (under the "independent source" exception, "evidence obtained from an illegal search is admissible if the same evidence was also obtained from a

_____

[2] Because we conclude Recording 1 was not privileged, we need not consider the government's alternate argument that Lewis represented CC Pharmacy, not Carr, and that any privilege CC Pharmacy could have asserted expired when the company ceased to exist.

lawful source independent of the illegality"). As the government notes, "Carr's argument appears to be that, had the government not possessed Recording 1, it would not have sought to introduce Carr's email directing Hanson to tell the DEA that she had authorized the transfer and that Newberry had forgotten the form or Curry's testimony." That argument fails. So, even if Recording 1 intruded into Carr's privilege, the evidence here was not a "fruit" of that intrusion.

In sum, the district court did not err in admitting Curry's testimony or Carr's email.

### C. Deliberate Ignorance Instruction

Finally, Carr argues the district court erred by stating at the charge conference that it would give a "deliberate ignorance" instruction if Carr chose to testify. We disagree.

"A deliberate ignorance instruction informs the jury that it may consider evidence of the defendant's charade of ignorance as circumstantial proof of guilty knowledge." *Diaz*, 941 F.3d at 741 (cleaned up) (quoting *United States v. Ricard*, 922 F.3d 639, 655 (5th Cir. 2019)). Because such an instruction risks convicting a defendant for mere "negligence or stupidity," it "should only be given when a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate ignorance." *Ricard*, 922 F.3d at 655–56 (quoting *United States v. Wofford*, 560 F.3d 341, 352 (5th Cir. 2009)); *see also United States v. Araiza-Jacobo*, 917 F.3d 360, 366 (5th Cir. 2019) (discussing deliberate ignorance instruction).

Carr contends that the district court's statement impermissibly chilled his right to testify. Because the prosecution's case was so powerful, he argues his "only recourse to set the record straight would have been to testify during his case-in-chief." But "that avenue was cut off to him" by the court's stated intention to give a deliberate ignorance instruction if he

testified. As noted, Carr did not object, and so we review for plain error. *See Grzywinski*, 57 F.4th at 238.

We see no error here, plain or otherwise. Carr concedes there was "overwhelming[]" proof that CC Pharmacy was an illegal drug operation and, moreover, he admits he "undoubtedly lied to drug suppliers, pharmacy inspectors, and employees." His story, however, was that he just did not realize anything illegal was afoot. As he puts it in his brief, he would have testified that he was merely "a naïve and foolish participant but not a conspirator" and that his "lies could just as easily have been to avoid red tape or to appease a less morally scrupulous Dustin Curry's sensibilities." That is a textbook case for a deliberate ignorance instruction.[3] A district court does not err by informing a defendant about the legitimate consequences that will flow from a decision to testify. *See United States v. Webber*, 208 F.3d 545, 552–53 (6th Cir. 2000). Here, a deliberate ignorance instruction was plainly one of them.

Furthermore, as the government argues, "Carr has not shown that, but for the court's statement, he would have testified." Many things might have led Carr to forgo testifying: the prospect of cross-examination, for instance, or the risk of a perjury sentencing enhancement. The record is silent on this point—no doubt because Carr failed to object to the district court's statement. Accordingly, we cannot find that the district court's statement (even assuming it was improper) affected Carr's substantial rights.

---

[3] *See, e.g.*, *Diaz*, 941 F.3d at 741 (instruction appropriate when defendant's "charade of ignorance" could be "circumstantial proof of guilty knowledge" (citation omitted)); *Araiza-Jacobo*, 917 F.3d at 367 (instruction appropriate when "the circumstances were so overwhelmingly suspicious that [the defendant's] failure to conduct further inspection or inquiry suggests a conscious effort to avoid incriminating knowledge" (citation and internal quotation marks omitted)).

Finally, Carr claims his argument is supported by our decision in *Ricardo*. We disagree. In that case, we cautioned that a perjury sentencing enhancement cannot be "based entirely on the jury's verdict without any independent findings by the court." *Ricardo*, 472 F.3d at 285–86. A court's suggesting otherwise to a defendant could chill a defendant's right to testify. *Ibid.* This case is different. As discussed, here the evidence plainly supported giving a deliberate ignorance instruction if Carr decided to testify. That would have been the legitimate price of his claiming "lack of guilty knowledge" in the face of overwhelming evidence to the contrary. *Wofford*, 560 F.3d at 352.

## IV. Conclusion

For the foregoing reasons, the judgment is AFFIRMED.