# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 17, 2025

Lyle W. Cayce
Clerk

———————

No. 23-30641

———————

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

ASHTON J. RYAN, JR.,

*Defendant—Appellant*.

———————————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:20-CR-65-1

———————————————————————

Before JONES, STEWART, and RAMIREZ, *Circuit Judges*.

CARL E. STEWART, *Circuit Judge*:

In February 2023, a jury convicted Ashton J. Ryan, Jr. of conspiracy to commit bank fraud, bank fraud, and making false entries in bank records. 18 U.S.C. §§ 1344, 1349, 1005, 2. Jurors were presented with evidence that Ryan conspired with others to misrepresent the ability of borrowers to repay their debts while acting as the President and CEO of First NBC Bank (the "Bank") and Chairman of the Bank's Board of Directors (the "Board"). In doing so, he deceived the Bank into issuing loans to insolvent borrowers who then covertly used those proceeds to make payments on their overdue and overdraft loans. Ryan does not dispute these loans. Rather, he contends that

there is insufficient evidence that he intended to defraud the Bank and deprive it of property under the fraud statutes.

Ryan challenges his convictions on four main grounds. First, he argues that the jury verdict should be vacated because the evidence at trial was insufficient to support his convictions for conspiracy to commit bank fraud, bank fraud, and making false entries in bank records. Second, he contends that the district court abused its discretion in its issuance of jury instructions on his charges for conspiracy to commit bank fraud, bank fraud, and making false entries in bank records. Third, he asserts that the district court abused its discretion by admitting lay opinion and summary testimony. And fourth, he maintains that the district court erred when it denied his motion to dismiss the indictment based on the Government's search of his personal email account. Because the evidence was sufficient to support Ryan's convictions and the district court neither abused its discretion nor erred, we AFFIRM the jury verdict in full.

**I**

In 2006, in the wake of Hurricane Katrina, the Bank was founded by a group of New Orleans businessmen. Ryan was selected to serve as the President and CEO of the Bank as well as Chairman of the Board. The Bank specialized in commercial banking and made money by issuing loans to borrowers. In 2017, the Louisiana Office of Financial Institutions and the Federal Deposit Insurance Corporation (the "FDIC") closed the Bank after it experienced a liquidity crisis the previous year. Due to the Bank's failure, the FDIC's Deposit Insurance Fund lost approximately $996 million.

In August 2021, a federal grand jury charged Ryan, Chief Credit Officer William J. Burnell, Executive Vice President Robert B. Calloway, Senior Vice President Fred V. Beebe, and businessman and borrower Frank J. Adolph with conspiracy to commit bank fraud (Count 1), bank fraud

(Counts 2–37), and making false entries in bank records (Counts 38–49) in a Second Superseding Indictment (the "Indictment"). At bottom, the Indictment alleged that Ryan and his codefendants conspired to defraud the Bank by misrepresenting the credit risk rating, purpose, and method of repayment of various loans. After Burnell, Calloway, and Adolph pleaded guilty, the trial against Ryan and Beebe began on January 9, 2023.

*A. The Trial*

*i. Evidence of the Credit Review Process*

Evidence presented at trial revealed the Bank's credit review process. Burnell and other witnesses testified that the Bank employed loan officers who maintained loan portfolios and drafted credit packages for borrowers. The first page of a credit package would contain a credit memorandum with information about the loan, including the loan's credit risk rating, purpose, and the sources of repayment. Burnell explained that loan officers recommended the initial credit risk ratings for loans, which he approved. Loans were rated from "1" to "10." The best loans were rated a "10," while the worst loans were rated a "1." Each credit memorandum also included the loan officer's signature, Burnell's initials, and Ryan's signature.

Jurors also heard testimony about three entities that oversaw the Bank's work. First, former Board member William Aaron, Jr. explained that the Board oversaw the Bank through information provided by Ryan, Burnell, and others at monthly Board meetings and subcommittee meetings. Second, Krystal Calix, an auditor at Ernst & Young, shared that the Bank hired the accounting firm for periodic audits. After reviewing the Bank's financial statements, Calix and other auditors would create a report for the Board's Audit Committee. The auditors relied on information they received from Bank employees, including Ryan and Burnell. Third, FDIC examiner Timothy Strain testified that because the FDIC insured deposits at the Bank

No. 23-30641

up to $250,000, its examiners assessed the risks at the Bank. Aaron similarly testified that FDIC examiners periodically audited the Bank based on information from the Bank's records and employees.

### ii. Evidence of the Conspiracy

Witnesses testified about the Bank's practice of issuing loans to overdrawn and past-due borrowers.[1] Aaron testified that borrowers who had overdrafts at the end of the month would appear on the Overdraft Report. Similarly, borrowers who made late payments on their loans would appear on the Past-Due Report. Ryan, Burnell, and other Bank employees issued new loans at the end of the month to keep borrowers off the Overdraft and Past-Due Reports, which were both presented to the Board. This maneuver of supplying overdrawn and past-due borrowers with more loan money to cover payments on existing loans violated the Bank's policy on interest capitalization—particularly when those borrowers were not creditworthy and did not have the ability to repay their debts in the normal course of business.[2] Nonetheless, this practice was so common under Ryan's leadership that it became known as the month-end "scramble."

Burnell testified about Ryan's "incremental authority," which authorized Ryan to approve loans up to $1 million "once per customer relationship until submitted to the [Bank's] Senior Loan Committee or Board

---

[1] As charged, Ryan's conspiracy involved the following seven borrowers: Gary Gibbs, Kenneth Charity, Gregory St. Angelo, Frank J. Adolph, Arvind Vira, Jeffrey Dunlap, and Warren Treme. They each testified at trial. Evidence of Gibbs's and Charity's participation in the scheme is discussed *infra* Part III. Evidence of the other borrowers' involvement is discussed in the Government's brief.

[2] The Bank's policy on interest capitalization could be found in the First NBC Bank Loan Policy Manual. During cross-examination, former loan officer Dean Haines testified that loaning money to borrowers to help them pay the interest on their loans violated this policy.

Loan Committee for review." Burnell explained that Ryan's incremental authority was intended "to meet the emergency needs or immediate needs of borrowers when [the Bank] didn't have time to go through the credit review [process]—or didn't have time to go through the proper approval process." However, Ryan exceeded his incremental authority "to cover month end, past dues, [and] overdrafts" to prevent borrowers from appearing on the month-end Overdraft and Past-Due Reports. Because Ryan could only use his incremental authority to approve loans for borrowers who had a credit risk rating of at least "5," Ryan and others falsely inflated certain borrowers' credit risk ratings.

### iii. Ryan's Testimony

Ryan testified in his own defense over the course of two days. He denied defrauding the Bank, participating in a conspiracy, making false statements in bank records, instructing borrowers to falsify financial records, and making material omissions. Ryan further testified that he provided "workout" loans as "a more flexible approach to dealing with customers [who] were struggling." Finally, he testified that he disclosed information about loans and overdraft lending to the Board, auditors, and examiners.

Ryan's testimony was unpersuasive. On February 9, 2023, the jury found Ryan guilty on all counts. Beebe was acquitted. The trial lasted twenty-three days.

### B. Post Trial

In September 2023, the district court sentenced Ryan to a below-Guidelines term of imprisonment of 170 months. The district court ordered him to pay restitution in the amount of approximately $215 million. He then filed a motion for a judgment of acquittal, to arrest the judgment, and for a new trial. The district court denied each of these motions, and Ryan timely appealed.

No. 23-30641

## II

The district court had jurisdiction over this criminal case under 18 U.S.C. § 3231. Because this is an appeal from a final judgment, this court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## III

On appeal, Ryan first challenges the sufficiency of the evidence supporting his convictions of conspiracy to commit bank fraud, bank fraud, and making false entries in bank records. He also argues that the district court abused its discretion in its issuance of jury instructions on his charges for conspiracy to commit bank fraud, bank fraud, and making false entries in bank records. He further contends that the district court abused its discretion by admitting lay opinion and summary testimony from witnesses. Finally, he maintains that the district court erred when it denied his motion to dismiss the indictment based on the Government's search of his personal email account.

### A. Sufficiency of the Evidence

We review preserved sufficiency-of-the-evidence challenges de novo. *United States v. Gibson*, 875 F.3d 179, 185 (5th Cir. 2017). When reviewing the sufficiency of the evidence, a court must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011) (internal quotation marks and citation omitted). Evidence is to be viewed "in the light most favorable to the verdict." *Id.* (internal quotation marks and citation omitted). Moreover, courts are to "accept[] all credibility choices and reasonable inferences made by the trier of fact which tend to support the verdict." *Id.* (internal quotation marks and citation omitted). The evidence presented need not "exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of

6

guilt." *Id.* (internal quotation marks and citation omitted). Furthermore, "any conflict in the evidence must be resolved in favor of the jury's verdict." *Id.* (citation omitted). "[W]e do not lightly overturn a determination by the trier of fact that the accused possessed the requisite intent." *United States v. Umawa Oke Imo*, 739 F.3d 226, 235 (5th Cir. 2014) (internal quotation marks and citation omitted). We will consider the sufficiency of the evidence under each statute in turn.

### i. Conspiracy to Commit Bank Fraud and Bank Fraud

Under 18 U.S.C. § 1349, it is a crime to conspire to commit bank fraud. *See United States v. Giles*, 592 F. App'x 309, 310 (5th Cir. 2015) (per curiam) (unpublished). "To be convicted of conspiracy under § 1349, the jury must find: (1) two or more persons agreed to commit fraud; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined the agreement with the intent to further the unlawful purpose." *United States v. Beacham*, 774 F.3d 267, 272 (5th Cir. 2014). A conspiratorial "agreement may be inferred from concert of action, voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances." *United States v. Stephens*, 571 F.3d 401, 404 (5th Cir. 2009).

Under 18 U.S.C. § 1344(1), it is a crime to knowingly execute, or attempt to execute, a scheme or artifice to defraud a financial institution. The elements of bank fraud are (1) "the defendant knowingly executed a scheme or artifice"; (2) "the scheme or artifice was to defraud a financial institution"; (3) "the defendant had the intent to defraud the financial institution"; (4) "the scheme or artifice to defraud was material [employed a false material representation][concealed a material fact]"; and (5) "the

No. 23-30641

defendant placed the financial institution at risk of civil liability or financial loss." *5th Cir. Pattern Jury Instr. (Crim.)* § 2.58A (2024).[3]

Ryan raises several challenges to the sufficiency of the evidence. First, he argues that his convictions are based on the invalid legal theory that he deprived the Board of accurate information, citing *Ciminelli v. United States*, 598 U.S. 306 (2023), *cert. denied*, 144 S. Ct. 2518 (2024) ("*Ciminelli*"). He also cites *United States v. Yates*, 16 F.4th 256 (9th Cir. 2021) ("*Yates*"), for the proposition that his fraud convictions cannot be sustained on a theory that he deprived the Bank of the amounts that it paid him in salary. Second, Ryan contends that the evidence established, at most, that he violated civil banking regulations, policies, and practices. Third, he asserts that he disclosed issues with the borrowers to the Board, auditors, and examiners. Fourth, Ryan claims that he did not intend to fraudulently deprive the Bank of funds but instead exercised poor judgment as a banker. Fifth, he maintains that his inclusion of the phrase "working capital" in loan documents permitted the use of loan proceeds to make loan payments and clear overdrafts. For these reasons, Ryan argues that his convictions for conspiracy to commit bank fraud and bank fraud should be vacated.

The Government responds that the evidence was sufficient for Ryan's convictions for conspiracy to commit bank fraud and bank fraud because they were based on years of fraudulent conduct established through a lengthy record. It also contends that *Ciminelli* and *Yates* are inapposite because Ryan's lies caused the Bank to lose money rather than accurate information or salaries. It cites *United States v. Greenlaw*, 84 F.4th 325, 346–47 (5th Cir. 2023), for support. It presses that in *Greenlaw*, we affirmed convictions for

---

[3] Ryan's trial took place before the Fifth Circuit Pattern Jury Instructions were updated in 2024, but the 2019 Pattern Instructions contained the same elements for the statutes at issue here.

conspiracy to commit fraud where the government argued that the defendants deprived investors of accurate information *and* money because "the foremost scheme alleged . . . was for the [a]ppellants to obtain money from investors, and the [g]overnment's mountain of evidence supporting [that] theory [was] sufficient, regardless of the invalidity of its subsidiary theory." *Id.* at 347. As to Ryan's argument that the evidence merely shows that he violated civil banking regulations, policies, and practices, the Government retorts that the evidence "provided the necessary context to understand Ryan's actions and intent while he was at the Bank." Addressing Ryan's argument that he disclosed issues with the borrowers to the Board, auditors, and examiners, the Government explains that "disclosure is fraudulent if it omits material information or is otherwise misleading." Finally, the Government counters that lying in loan documents and to the Board, auditors, and examiners is still a crime even if Ryan used the broad term "working capital." For these reasons, the Government argues that Ryan's convictions for conspiracy to commit bank fraud and bank fraud should be affirmed. We agree.

There is sufficient evidence for Ryan's convictions for conspiracy to commit bank fraud and bank fraud. Ryan does not seriously press that any of the conspiracy elements are missing from the evidence. Nor could he. The voluminous record extensively outlines his surreptitious and unauthorized agreements with borrowers and bank employees. Instead, the thrust of Ryan's argument is that, in light of *Ciminelli* and *Yates*, his conduct, while perhaps unwise, did not rise to the level of fraud under 18 U.S.C. § 1344. He is wrong.

The evidence in this case supports all the requisite elements of fraud under 18 U.S.C. § 1344. The evidence presented at Ryan's month-long trial shows that he (1) "knowingly executed a scheme or artifice"; (2) "to defraud" the Bank; (3) that he intended to do so; (4) that his "scheme or

artifice to defraud was material" because he "employed a false material representation" about several borrowers' ability to repay their loans and "concealed material facts" about those borrowers' from the Board; and (5) that he placed the Bank "at risk of . . . financial loss." *See 5th Cir. Pattern Jury Instr. (Crim.)* § 2.58A. Thus, the evidence is sufficient.

Ryan attempts to evade this reality by misconstruing the Government's position as being that he improperly deprived the Board of economic information and his salary. He cites *Ciminelli* and *Yates* for support. Indeed, he presses that "[t]his entire case . . . [is] controlled by the recent United States Supreme Court decision in [*Ciminelli*], as well as [*Yates*]." Ryan argues that those authorities are fatal to the Government's case. The truth, however, is that neither case controls, and thus, Ryan's argument is doomed.

In *Ciminelli*, the defendants conspired to rig a nonprofit-administered contract bidding process by designing criteria that would ensure that their preferred company would be selected to receive hundreds of millions of dollars in state contracts. 598 U.S. at 310. The government's indictment and trial strategy rested solely on a theory that they schemed to deprive the nonprofit of potentially valuable economic information necessary to make discretionary economic decisions. *See id.* The Second Circuit affirmed the defendants' convictions consistent with its "right-to-control theory"— which expanded wire fraud under 18 U.S.C. § 1343 to include deprivation of "information necessary to make discretionary economic decisions." *See id.* In reversing the judgment of the Second Circuit, the Supreme Court explained that "federal fraud statutes criminalize only schemes to deprive people of traditional property interests." *Id.* at 309. It held that "potentially valuable economic information," which is "necessary to make discretionary economic decisions" is not a traditional property interest." *Id.*

*Ciminelli* is inapposite. Here, the Government's case did not rely on a theory of deprivation of information. Instead, it detailed Ryan's lies to get loans so that he could keep insolvent borrowers flush with cash, clear his subpar monthly reports, and in some instances, benefit monetarily given his business and lending relationships with borrowers.

*Yates* is similarly incongruous. There, the Ninth Circuit rejected the government's argument that the defendants deprived a bank of salaries and accurate information. 16 F.4th at 265. But here, the Government does not press such a theory. And even if it did, that theory takes a backseat to its theory that Ryan lied to get the Bank to issue loans. *Greenlaw*, 84 F.4th at 346–47 (affirming convictions for conspiracy to commit fraud because "the foremost scheme alleged . . . was for the Appellants to obtain money from investors, and the [g]overnment's mountain of evidence supporting this theory is sufficient, regardless of the invalidity of its subsidiary theory").

In sum, the evidence shows that Ryan conspired with others to lie and mislead the Bank's Board, auditors, and examiners so that it would issue loan money—a traditional property interest—to insolvent borrowers. Because a rational trier of fact could conclude that Ryan's conduct constituted a scheme to deprive the Bank of loan money, there is sufficient evidence to support his convictions for conspiracy to commit bank fraud and bank fraud. *See Moreno-Gonzalez*, 662 F.3d at 372.

### ii. Making False Entries in Bank Records

Under 18 U.S.C. § 1005, it is a crime to make a false entry in any book, report, or statement of a federally insured bank, knowing the entry is false, with intent to injure or defraud the bank. To establish a violation of § 1005, the government must prove that: "(1) an entry made in bank records is false; (2) the defendant made the entry or caused it to be made; (3) the defendant knew the entry was false at the time he or she made it; and (4) the defendant

intended that the entry injure or defraud the bank or public officers." *United States v. Chaney*, 964 F.2d 437, 448 (5th Cir. 1992). The government "need not prove intent to cause the bank injury; all that is required is that the defendant intended to defraud one or more of the bank's officers, auditors, examiners, or agents." *Id.* at 449.

In *Thompson v. United States*, 145 S. Ct. 821, 829 (2025) ("*Thompson*"), the Supreme Court held that a similar statute, 18 U.S.C. § 1014, only applies when statements are literally false, not merely misleading. In *Thompson*, the defendant borrowed $219,000 from a bank, which later failed. *Id.* at 824. During a call with the FDIC's loan servicer, Thompson disputed his $269,120.58 balance—$219,000 plus interest—stating that he had "no idea where the 269 number comes from" and that he "borrowed . . . $110,000." *Id.* Thompson was later convicted for violating 18 U.S.C. § 1014, which prohibits "knowingly mak[ing] any false statement" to influence the FDIC's action on any loan. *Id.* at 825. At trial, Thompson argued that his statements were not false because he had in fact borrowed $110,000, even though he later borrowed more. *Id.* The district court and the Seventh Circuit concluded that they need not reach that argument because they read § 1014 to also criminalize misleading statements. *Id.* The Supreme Court reversed, reasoning that under the plain text of § 1014, "it is not enough that a statement is misleading. It must be 'false.'" *Id.* at 829. The Court explained, however, that some misleading statements are also false and that "context is relevant to determining whether a statement is false." *See id.* at 826–29.

Ryan argues that there is insufficient evidence to support his conviction for making false entries in bank records under 18 U.S.C. § 1005. He contends that while *Thompson* concerned § 1014, its logic applies to his convictions under § 1005. In his view, "[b]oth sets of statutes criminalize

statements in bank records that are false, with no statutory inclusion of misleading statements." He further presses that "[a]ll of the alleged false statements presented by the Government lacked the requisite element of being false, and only false, as distinguished from being misleading which is not a violation of these types of federal fraud under *Thompson*."

The Government asserts that the evidence sufficiently supports Ryan's convictions of making false entries in bank records. It contends that the evidence at trial "demonstrated the many outright lies that Ryan and his coconspirators told the Board and included in Bank documents to further their scheme." It presses that "Ryan's representations, when considering the context in which they were made, do not undermine the jury verdict given Ryan's numerous outright lies and omissions in furtherance of his loan fraud scheme." It acknowledges that Ryan's convictions under 18 U.S.C. § 1005 include three affirmative false statements and five material omissions. And it argues that "Ryan's affirmative statements and material omissions rendered his statements false."

We agree with the Government that sufficient evidence supports Ryan's convictions for making false entries in bank records. The evidence in this case supports all the requisite elements of 18 U.S.C. § 1005. The record evidence establishes that Ryan made false entries in the books, reports, or statements of the Bank, knowing that those entries were false, with the intent to injure or defraud the Bank. 18 U.S.C. § 1005. Ryan argues that the entries he made cannot be considered "false" after *Thompson*. He is wrong.

As stated *supra*, Ryan's convictions under 18 U.S.C. § 1005 include three affirmative false statements and five material omissions. The affirmative false statements (Counts 38–40) include three Change in Terms

Authorization forms for Kenneth Charity.[4] Within each, Ryan stated that an extended loan maturity date was necessary because Charity's "CPA has resigned due to work overload and loss of employee delaying financial statements." But in truth, Charity's CPA fired Charity as a client because Charity would not provide him with "information going forward on a routine monthly basis," which was an "ongoing issue." Ryan knew this before he signed off on each of the false Change in Terms Authorization forms. Further, the Change in Terms Authorization forms included a checklist that required responses from Ryan. Ryan responded "no" to whether Charity was "currently in default on one or more loans," "unable to obtain similar credit & terms from outside sources," and experiencing "temporary cash flow issues." The evidence establishes that Ryan knew these responses were literally false, not merely misleading, when he made them.

Turning to Ryan's five material omissions (Counts 41, 43, 44, 47, and 48), context reveals that those statements amounted to literal falsehoods as well. *See Thompson*, 145 S. Ct. at 826–29 (recognizing that some misleading statements are also false and that "context is relevant to determining whether a statement is false"). Each of those counts is based on a Criticized Asset Action Plan that Ryan provided the Board about Gary Gibbs.[5] The FDIC requested these plans for risky or substandard loans. These plans were sent to the Board Loan Committee and describe "the action plan for getting rid of that risk from the [B]ank." Each Criticized Asset Action Plan included a credit risk rating along with sections titled "Reason for Criticism/Existing Problems/Borrower Status" and "Is Borrower status Improving, Declining,

---

[4] Charity was a borrower who owned real estate in Louisiana. A Change in Terms Authorization form permitted the Bank to "kick" a loan "down the road without a formal package" to allow the loan to "be extended a short term."

[5] Gibbs was a real estate developer and one of the Bank's largest borrowers.

or Stable? Why?" Each of the five Criticized Asset Action Plans that Ryan prepared about Gibbs listed his credit risk rating at "5" out of 10, stated that Gibbs's loans were "performing as agreed," and described Gibbs's loan status as "stable." Critically, none of the plans mentioned that the bankers were paying Gibbs's loans and overdrafts with proceeds from new loans. Given the goals of the Criticized Asset Action Plan process, the Bank's policies on capitalized interest, and Ryan's knowledge of Gibbs's struggling finances, Ryan's statements on each Criticized Asset Action Plan were literally false.

In sum, because a rational trier of fact could conclude that each count, viewed in the appropriate context, is supported by evidence of a falsehood, there is sufficient evidence to support Ryan's convictions for false entries in bank records. *See Thompson*, 145 S. Ct. at 829; *Moreno-Gonzalez*, 662 F.3d at 372. Thus, Ryan's sufficiency of the evidence challenges fail.

### B. Jury Instructions

We generally review jury instructions for abuse of discretion. *United States v. Hamilton*, 46 F.4th 389, 393 (5th Cir. 2022). "However, when a jury instruction hinges on a question of statutory construction, our review is de novo." *United States v. Thompson*, 811 F.3d 717, 728 (5th Cir. 2016) (citation omitted). A jury instruction is not an abuse of discretion if it is "a correct statement of the law" and "clearly instructs jurors as to the principles of law applicable to the factual issues confronting them." *Hamilton*, 46 F.4th at 394 (quoting *United States v. Freeman*, 434 F.3d 369, 377 (5th Cir. 2005) (internal quotation marks omitted)).

A district court abuses its discretion when it refuses to adopt a suggested jury instruction that is "(1) substantively correct, (2) not substantially covered in the jury charge, and (3) concerns an important point in the trial so that the failure to give it seriously impairs the defendant's

ability to present effectively a particular defense." *United States v. Uhlenbrock*, 125 F.4th 217, 228 (5th Cir. 2024) (internal quotation marks and citation omitted). "A district court does not err, however, if the jury charge tracks the Fifth Circuit Pattern Instructions and correctly states the law." *Id.* (internal quotation marks and citation omitted). "Any error is subject to harmless error review." *United States v. Aldawsari*, 740 F.3d 1015, 1019 (5th Cir. 2014). District courts are afforded "substantial latitude" in formulating jury instructions. *United States v. Rochester*, 898 F.2d 971, 978 (5th Cir. 1990). And "an erroneous jury instruction is reversible only if it affected the outcome of the case." *Westport Ins. Corp. v. Pa. Nat'l Mut. Cas. Ins. Co.*, 117 F.4th 653, 666 (5th Cir. 2024) (internal quotation marks and citation omitted).

### *i. Conspiracy to Commit Bank Fraud and Bank Fraud*

Once again invoking *Ciminelli*, Ryan argues that the district court erred because it did not give instructions on the definition of property under 18 U.S.C. §§ 1344 and 1349. He presses that, as a result, the jury was free to convict Ryan based on his interference with the Bank's right to control its assets in contravention of *Ciminelli*'s holding. He argues that this constituted reversible error. Ryan further contends that he "proffered numerous jury instructions that would have neutralized the [G]overnment's misleading presentation and prevented the [G]overnment from resting its case on alleged material misstatements or omissions that, themselves, rested on banking or accounting regulations, policies, and practices."[6] In his view, the court erred in rejecting his requests to present those instructions to the jury.

The Government responds that Ryan has not established that the district court abused its discretion by rejecting his requested jury

_____

[6] As discussed in the Government's brief:

No. 23-30641

instructions. It contends that Ryan does not identify anything inaccurate in the district court's instructions. It further states that "the district court crafted instructions that informed the jury of the elements of the charged offenses and the defense of good faith" and maintains that "Ryan was 'not entitled to a judicial narrative of his version of the facts.'"

The district court did not abuse its discretion by refusing to give Ryan's requested jury instructions. As discussed, a jury instruction is not an abuse of discretion if it is "a correct statement of the law" and "clearly instructs jurors as to the principles of law applicable to the factual issues confronting them." *Hamilton*, 46 F.4th at 394 (quoting *Freeman*, 434 F.3d at 377 (internal quotation marks omitted)). And a district court does not err if the jury charge "tracks the Fifth Circuit Pattern Instructions and correctly states the law." *Uhlenbrock*, 125 F.4th at 228 (internal quotation marks and citation omitted). Here, the district court gave pattern jury instructions. Ryan does not argue that the district court's instructions as to his charges for conspiracy to commit bank fraud and bank fraud incorrectly stated the law.

---

Ryan requested the district court instruct the jury: (1) that it should not consider evidence that Ryan violated banking or accounting rules, regulations, policies, or practices when determining Ryan's guilt; (2) that "disclosure prohibits a finding of criminal or fraudulent intent to the charges for all counts of the [i]ndictment, because disclosure on the part of the defendant is, simply, inconsistent with making a false material statement or omission of material fact"; (3) that "FDIC and [Louisiana Office of Financial Investigations] violations . . . can be appropriately enforced by the FDIC, and they may not form the basis for a criminal conviction"; (4) that it is not a crime "for a bank officer to support or approve a loan to a business associate simply because the banker owed that business associate money"; (5) that "[i]t is not illegal for a borrower to use his bank loan or line of credit, to pay another loan payment or an overdraft; and (6) "that a false entry is not committed where the transaction, as entered on a bank's books or records, actually took place and was entered as it actually occurred."

17

Instead, he merely requests additional instructions as to his erroneous *Ciminelli* argument and to support his attempts to "neutralize[]" the Government's case. He fails to establish that the district court was required to present his proffered instructions to the jury.[7] And even if Ryan could show any error in the use of our pattern jury instructions, any such error would be harmless in light of the considerable evidence of his guilt on conspiracy to commit bank fraud and bank fraud. Thus, the district court did not abuse its discretion in declining to give Ryan's requested instructions on conspiracy to commit bank fraud and bank fraud.

### ii. Making False Entries in Bank Records

Ryan argues that "[t]he [c]ourt did not properly instruct the jury that it could not return a guilty verdict based on misleading statements that were not totally false . . . in accordance with *Thompson*." Ryan asserts that the instructions contained "no qualification, limitation or instruction that statements that are misleading, but true, cannot support a guilty verdict." He concludes that "[t]he jury was, thus, invited to find, or at least not prohibited from finding, that the numerous statements by [him] alleged to be false, were only misleading, affirmatively or because of material omissions, and, thus, allowed to return a verdict of guilty based on the misleading statements."

The Government counters that notwithstanding *Thompson*, the jury was correctly instructed on affirmative statements and material omissions. It contends that "[t]he district court's jury instructions followed the elements of the charged crimes." And even if Ryan could show any error with the

---

[7] Ryan's *Thompson* arguments here are unavailing. 145 S. Ct. at 829. In *Thompson*, the Court made clear that its analysis was rooted in the text of 18 U.S.C. § 1014, which is distinct from the text of the fraud statutes that Ryan was convicted on in this case. *See id.* at 827. Thus, *Thompson* does not control this court's consideration of what constitutes fraud under 18 U.S.C. §§ 1344 and 1349.

instructions, the Government presses that any such error would be harmless given the evidence in this case.

Notwithstanding *Thompson*, the district court did not abuse its discretion by issuing jury instructions on Ryan's charges for making false entries in bank records. 145 S. Ct. 821. As a preliminary matter, the district court's jury instructions as to Ryan's affirmative false statements (Counts 38–40) were plainly proper. For those counts, the district court instructed the jury that to convict Ryan it must find beyond a reasonable doubt that: (1) "[the Bank] was a federally insured bank," (2) "[Ryan] made a false entry in a book, report, or statement of [the Bank]," (3) "[Ryan] did so knowing it was false," and (4) "[Ryan] did so intending to injure or defraud [the Bank]." Those instructions track verbatim § 2.46 of the Fifth Circuit Pattern Jury Instructions and our case law on 18 U.S.C. § 1005. *See Chaney*, 964 F.2d at 448. Moreover, *Thompson* did nothing to disturb this hornbook recitation of the elements of 18 U.S.C. § 1005. Because the jury charge tracks the Fifth Circuit Pattern Instructions and correctly stated the law, the district court did not abuse its discretion by instructing the jury as to Ryan's affirmative false statements. *See United States v. Arthur*, 51 F.4th 560, 567 (5th Cir. 2022) (cleaned up).

As to Ryan's material omission counts (Counts 41, 43, 44, 47, and 48), however, *Thompson* may be more relevant. 145 S. Ct. 821. On those counts, the district court gave the following jury instructions:

> Title 18, United States Code, section 1005, makes it a crime for anyone to make a false entry in any book, report, or statement of a federally insured bank, knowing the entry is false, with intent to injure or defraud the bank. For you to find the defendant guilty of this crime, you must be convinced that the Government has proved each of the following beyond a reasonable doubt: first: that the First NBC Bank was a federally

insured bank; second: that the defendant deliberately omitted a material fact in a book, record, or statement of First NBC Bank—a material omission is one that would naturally tend to influence, or was capable of influencing, the decision of First NBC Bank, and; third, that the defendant did so intending to injure or defraud First NBC Bank. To sustain a charge of false entry by material omission of fact, the prosecution must prove, beyond a reasonable doubt, that the defendant had an affirmative duty to include the statement omitted in the book, report, or statement alleged by the grand jury.[8]

Here, too, the district court's instructions track § 2.46 of the Fifth Circuit Pattern Jury Instructions.

To be sure, Ryan is correct that these instructions permitted the jury to return a verdict of guilty based on "misleading statements." But Ryan overreads *Thompson* in proclaiming that a § 1005 conviction can no longer be supported by evidence of a defendant's misleading statements. All *Thompson* says is that (1) a misleading statement is not necessarily a false statement, and (2) a false statement is necessary under 18 U.S.C. § 1014. 145 S. Ct. at 829. Indeed, the defendant's statement in *Thompson* itself—that he borrowed $110,000 when the full amount was $219,000—was misleading but true. *Id.* at 824. By contrast, Ryan's statements about Gibbs in this case—that his credit risk rating was a "5," that his loans were "performing as agreed," and that his loan status was "stable"—were misleading and false. This distinction reveals that the district court's instructions were not erroneous. Plainly put, misleading material omissions can be false in context. *See id.* at 826–29 ("[C]ontext is relevant to determining whether a statement is false."). Further, the district court's specific instructions on material omissions were preceded by the general rule that 18 U.S.C. § 1005 "makes it

---

[8] The capitalization of each letter has been removed for clarity.

a crime for anyone to make a false entry in any book, report, or statement of a federal insured bank, knowing the entry is false, with intent to injure or defraud the bank." Taken together, the district court's instructions were "a correct statement of the law" and "clearly instruct[ed] jurors as to the principles of law applicable to the factual issues confronting them." *Hamilton*, 46 F.4th at 394 (cleaned up). This conclusion accords with the "substantial latitude" afforded to district courts in formulating jury instructions. *Rochester*, 898 F.2d at 978.

Finally, even if the district court erred in instructing the jury, that error was likely harmless because, as discussed, the weight of the evidence establishes that Ryan's material omissions in Counts 41, 43, 44, 47, and 48 amount to literal falsehoods when viewed in context. To the extent that the district court erred, it was not reversible error given *Westport*, 117 F.4th at 666 (noting that an erroneous jury instruction is reversible only if it affected the outcome of the case). Thus, the district court did not abuse its discretion in its jury instructions on Ryan's charges for making false entries in bank records.

### C. Lay Opinion and Summary Testimony

Evidentiary rulings are reviewed under an abuse-of-discretion standard, "subject to [a] harmless-error analysis." *United States v. Girod*, 646 F.3d 304, 318 (5th Cir. 2011). The admission of evidence is reversible error only when the defendant's rights were "substantially prejudiced" by the admission. *Id.* at 318–19 (internal quotation marks and citation omitted).

The admissibility of opinions by lay witnesses is governed by Federal Rule of Evidence 701, which provides that nonexpert witnesses may only offer opinion testimony that is rationally based on their perception, helpful, and not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. "[T]he distinction between lay and expert witness

testimony is that lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'" *United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008) (citations omitted). "[A] lay opinion must be the product of reasoning processes familiar to the average person in everyday life." *Id.* (internal quotation marks and citation omitted).

Under Federal Rule of Evidence Rule 1006, witnesses may use a summary, chart, or calculation offered "to prove the content of 'voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court,'" whether or not they have been introduced into evidence. *See United States v. Earnest*, 132 F.4th 905, 913 (5th Cir. 2025) (quoting FED. R. EVID. 1006(a)). Summary witnesses may make reasonable inferences based on the evidence. *See United States v. Armstrong*, 619 F.3d 380, 383–84 (5th Cir. 2010).

Ryan challenges the testimonies of several witnesses, including FDIC examiner Strain, Ernst & Young auditor Calix, the Bank's lawyer Kelly Longwell, and forensic accountants Yvonne Evans, Bobby Joe Hood II, and Josephine Beninati. He argues, in conclusory fashion, that these witnesses improperly offered their opinions about his culpability. He also contends that the Government's witnesses improperly testified as to summary charts and that those charts contained inaccuracies.

The Government argues that Ryan has not proven that the district court erred in admitting witness testimony and summary evidence. It stresses that these evidentiary issues were litigated below multiple times, both before and after trial. It specifically highlights that the district court overruled Ryan's objections regarding FDIC examiner Strain, observing that Strain was merely testifying about his experiences with Ryan and other bankers. As to the summary witnesses, the Government contends that "the district court

permitted them to testify using charts that summarized financial transactions as demonstrative exhibits," and that few of these charts were admitted into evidence.

The district court did not abuse its discretion by admitting lay opinion testimony and summary testimony from witnesses. Ryan plainly fails to substantiate his arguments that the district court let witnesses improperly testify as experts. As to Strain in particular, the district court observed that "[Strain] is an examiner. He is testifying about his own work. I don't see any problem there." Given Ryan's sparse briefing on this issue and the robust evidentiary litigation below, he has not established that the district court abused its discretion by admitting lay witness testimony under Rule 701. *See* Fed. R. Evid. 701.

So, too, with summary evidence. Ryan failed to cite any case suggesting that the district court erred in allowing summary demonstratives and evidence to assist the jury in making sense of this month-long, billion-dollar bank fraud trial. Summary evidence is particularly appropriate in cases like these, in which the record consists of tens of thousands of complex documents which could not have been conveniently examined in court. *See Earnest*, 132 F.4th at 913 (citing Fed. R. Evid. 1006(a)). Ryan fails to cite any analogous authority suggesting that the Government's summary evidence was problematic. And to the extent that there were inaccuracies in any of the Government's summaries, Ryan has not established that those errors were meaningfully harmful in light of the overwhelming evidence in this case. *Girod*, 646 F.3d at 318 (explaining that evidentiary rulings are subject to a harmless-error analysis). Nor has he established "substantial prejudice[]." *Id.* at 318–19 (cleaned up). Thus, the district court correctly concluded that the charts offered by the Government did not exceed the scope of Rule 1006. In sum, the district court did not abuse its discretion by admitting lay opinion testimony and summary testimony from witnesses.

### D. Attorney-Client Privilege

We review a district court's denial of a defendant's motion to dismiss an indictment de novo. *United States v. Asibor*, 109 F.3d 1023, 1039 (5th Cir. 1997). "The issue is whether the government's prosecution of the crime would abridge fundamental protections against unfair treatment." *Id.* (internal quotation marks and citation omitted).

"Government misconduct does not mandate dismissal of an indictment unless it is so outrageous that it violates the principle of fundamental fairness under the due process clause of the Fifth Amendment." *United States v. Sandlin*, 589 F.3d 749, 758–59 (5th Cir. 2009) (quoting *United States v. Mauskar*, 557 F.3d 219, 231–32 (5th Cir. 2009)). The government's actions must be "shocking to the universal sense of justice," and "[s]uch a violation will only be found in the rarest circumstances." *Mauskar*, 557 F.3d at 232 (citations omitted). "Vanishingly few decisions have found a due process violation for government intrusion into the attorney client relationship." *Gaetano v. United States*, 942 F.3d 727, 732 (6th Cir. 2019). A defendant asserting such a claim must also show "actual and substantial prejudice." *United States v. Carr*, 83 F.4th 267, 275 (5th Cir. 2023) (citing *United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir. 1996)); *see United States v. Fulmer*, 722 F.2d 1192, 1195 (5th Cir. 1983) ("[A] district court may dismiss an indictment with prejudice only where it has been shown that governmental misconduct or gross negligence in prosecuting the case has actually prejudiced the defendant.").

Ryan contends that the district court erred in denying his motion to dismiss the indictment based on the Government's "execution and handling of [his] privileged communications" obtained through a search warrant on his email. He presses that the Government's search of his email violated his constitutional rights. He cites two district court opinions that, in his view,

outline "the proper standard and protocols" that the Government should employ in conducting a privilege review of a defendant's email.

The Government asserts that Ryan failed to establish that it deliberately or outrageously violated his attorney-client privilege. It presses that it acted in good faith in conducting the privilege review. And it contends that its "privilege review was consistent with court-approved procedures when investigators obtain data that may contain privileged information." It highlights that Ryan did not and cannot articulate any prejudice. While the Government acknowledges that its process was "imperfect," it maintains that "[n]one of Ryan's complaints about the execution of the Gmail search warrant . . . meet the demanding standard for dismissal." We agree.

The district court did not err when it denied Ryan's motion to dismiss the indictment based on the Government's search of his personal email account. Nothing in the Government's conduct rises to the level of shocking or outrageous behavior that would justify dismissal. *See United States v. Johnson*, 68 F.3d 899, 902 (5th Cir. 1995).

The Government detailed its relatively benign process for reviewing and screening Ryan's emails in its brief:

> The case agent downloaded the Gmail data from Google and, without reviewing any of the data, transferred it to an IT specialist who used an attorney-created list of search terms to identify potentially privileged material. Potentially privileged material was then reviewed by a filter attorney who was not on the prosecution team, while the documents that did not have search term hits were released to the prosecution and later all defendants in discovery.

Ryan primarily argues that the lead case agent should not have had pre-screening access to his Gmail data—even though there is no evidence that access was ever misused. While Ryan's arguments and authorities

establish that the Government could have conducted a better privilege review, they fall well short of establishing "outrageous" conduct. *See id.* Indeed, the district court correctly concluded that "while the [G]overnment's privilege review process was imperfect, it did not knowingly or recklessly intrude upon Ryan's privilege and, its conduct cannot be described as 'outrageous.'" And because there is no evidence that the Government's process impacted the outcome of this case, Ryan plainly fails to establish "actual and substantial prejudice." *Carr*, 83 F.4th at 275. Thus, the district court did not err when it denied Ryan's motion to dismiss the indictment based on the Government's search of his personal email account.

## IV

For the foregoing reasons, the jury verdict is AFFIRMED in full.